BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, APPELLANT, V. LUEDER CONSTRUCTION COMPANY, DEFENDANT AND THIRD-PARTY PLAINTIFF, AND THE PRESCON CORPORATION, THIRD-PARTY DEFENDANT, APPELLEES.

433 N.W.2d 485

Filed December 23, 1988.   No. 87-955.

Gerald P. Laughlin and Jill Robb Ackerman, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellant.

Waldine H. Olson and Kathleen C. Smith, of Schmid, Mooney & Frederick, P.C., and W.C. Nelson, of Nelson, Morrow, Waldron & Kivett, for appellee Lueder Construction.

Robert T. Grimit, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee Prescon Corp.

BOSLAUGH, SHANAHAN, and GRANT, JJ., and ENDACOTT and QUIST, D. JJ.

GRANT, J.

On April 13, 1984, the appellant, Board of Regents of the University of Nebraska (University), filed this action against Lueder Construction Company (Lueder) for damages premised on breaches of contract and warranty in the construction of the college of pharmacy building at the University of Nebraska Medical Center (UNMC) in Omaha. Lueder acted as general contractor on the project. Insurance Company of North America (INA), Lueder's performance bond surety for the project, was also named as a defendant. The district court granted INA's motion for summary judgment, and the University has not appealed that ruling.

The University's petition alleged two causes of action: (1) that Lueder breached its contract in that the exterior brick walls and the brick supporting structure had not been installed according to plans and specifications; and (2) that Lueder breached its contract in failing to install the number of steel reinforcing bars required in the floor slabs and in failing to posttension the tendons in both the floor slabs and spandrel

sections to specification force. Lueder's answer admitted and denied various factual allegations of the petition and pled that any claim which the University might have against Lueder was "specifically barred by the applicable statutes and periods of limitation for commencement of actions under the laws of the State of Nebraska."

The trial was bifurcated pursuant to Neb. Rev. Stat. § 25-221 (Reissue 1985) to determine the issues related to Lueder's statute of limitations defense. After a trial to the court on that issue, the district court for Douglas County held that the "action was brought more than two years after the existence of facts which would have, if pursued, led to the discovery of [the University's] causes of action" and was, therefore, barred by the applicable statute of limitations, Neb. Rev. Stat. § 25-223 (Reissue 1985). The district court further ordered that Lueder's third-party action against The Prescon Corporation (Prescon), seeking indemnification for all sums adjudged against Lueder, be dismissed.

The University timely appealed and in this court claims the district court erred (1) in finding that the action was barred by the statute of limitations, when the University, exercising reasonable diligence under the circumstances, did not discover facts which reasonably led to the discovery of the breach giving rise to its first cause of action until summer 1983, nor did it discover facts which reasonably led to the discovery of the breach giving rise to the second cause of action until February 20, 1984; (2) in not finding that the University exercised reasonable diligence to discover the defects, when there was sufficient evidence presented at trial to support such finding; and (3) in holding that a reasonable investigation in 1980 or 1981 should have led to the discovery of the defects set out in the plaintiff's two causes of action. We affirm.

The record shows that on May 6, 1974, the University contracted with architects Wilscam Mullins Birge, Inc. (Wilscam), for the design and continued inspection of construction of the college of pharmacy building. Wilscam hired Walter D. Rudeen and Associates, Inc. (Rudeen), to perform the structural engineering design work for the building. See *Board of Regents v. Wilscam Mullins Birge, ante*

p. 675, 433 N.W.2d 478 (1988). On May 19, 1975, the University entered into a written owner-contractor agreement with Lueder for Lueder to construct the building. Lueder contracted with Prescon to prepare shop drawings for the project.

The project was substantially completed on October 11, 1976, and the building was accepted by the University on that date. During the following year, University personnel monitored the new building for deficiencies. In March 1977, University personnel observed cracks beginning to form in the north and south exterior brick walls of the west section of the building. In preparation for a 1-year review of the building, George Money, director of planning and construction at UNMC, prepared a "punch list" of deficiencies to be reviewed by Wilscam and Lueder. The punch list, dated September 27, 1977, refers to several instances of brick cracking:

24. South wall has a crack at the east end of the west window, starting at the window sill and going up about half the window height, coming up about seven blocks (about half way up).

25. The overhang at the south wall west end. There is a crack that starts in the corner third brick up and then goes to the west up to the eighth brick.

26. Another crack on the south wall west side of the attrium [sic] that is up 18 blocks above the start of square block and over six blocks. Mortar joint missing on the east wall fifth course above the dock head about two blocks west of the television camera.

. . . .

28. On the north side the brick is broken out the fourth row down from the square brick course on the west end of the atrium. The west end of the atrium up five of the square brick crack starts and goes over half brick and then up the tile over the next joint. Goes on up about eight or nine courses.

On September 27, 1977, representatives of the University, Lueder, and Wilscam met to conduct the 1-year review of the building. The punch list items related to cracking were discussed, and it was agreed that Wilscam would perform a

further investigation of the cracks. The University asked Wilscam to provide a written report on the matter.

Structural engineer Walter Rudeen and Wilscam's field architect, Frederick Fast, visited the site in October 1977. During this visit, Rudeen investigated only one horizontal crack in the north wall and did not examine several diagonal "stairstep" cracks in the mortar, which had been brought to Wilscam's attention at the September 27, 1977, meeting. Walter Rudeen determined that the horizontal crack was caused by downward movement of a brick support angle, which had resulted from construction error. The Wilscam firm, in turn, orally reported to the University about the cause of the horizontal crack. Wilscam never provided the University with a written report on the causes of cracking and never provided any explanation as to the cause of the stairstep diagonal cracks. As architect Donald Mullins testified, "[T]he university did not make a big deal of the cracks in the walls." Wilscam orally advised the University in 1977 that the cracks were superficial and that they should be monitored and caulked to prevent further damage to the building.

Between 1977 and 1982, various University personnel monitored the cracks. Ralph Yarbrough was director of UNMC plant operations from July 1977 to May 1982. His department was responsible for the repair and maintenance of existing buildings on the UNMC campus. Yarbrough testified that he was concerned about the cracks when he first saw them in 1977, and he expressed his concern to Money, whose department was responsible for buildings under construction.

Money testified that while it was not unusual for brick buildings to crack, certain cracks in the college of pharmacy building were different than he had seen in other buildings, in that the location of the cracks at the lower corners of window openings was unusual. Money further testified that in 1977 the cracks were "not very large." They were 8 to 10 feet long, 16 or 18 in number, and about $1/8$ inch thick. His department was unable to repair the cracks in 1977 because he did not have the authority to order caulking done. He asked that Yarbrough's department do the caulking, but Yarbrough felt the cracks were punch list deficiencies subject to Lueder's 1-year warranty on

the building.

Although Money requested Wilscam to direct Lueder to repair the punch list cracks, the work was not completed. Yarbrough's department assumed the responsibility for repairing the cracks early in 1978 when it became apparent Lueder would not do so. Thus, Money testified, "[N]othing was done for a couple years' time."

Yarbrough did not make special trips to the building to see the cracks, but during casual observations of the building in 1978 and 1979, he noticed that more cracks appeared and that the existing cracks lengthened and widened. Yarbrough testified that the cracking continued and grew more extensive during 1980. The cracks were vertical, stairstep, and horizontal. To the best of Yarbrough's recollection, when a crack appeared, it did not stop, but kept on growing.

Yarbrough testified that from 1978 to 1982 the cracks were caulked quarterly or semiannually by physical plant maintenance people, but that caulking did not stop the cracking problem. No other buildings on the UNMC campus required annual caulking. Yarbrough felt the cracked condition of the college of pharmacy building was unusual because it was the "[f]irst and only building I've seen do it." Out of the approximately 300 brick buildings Yarbrough had been responsible for, he had never seen a brick building behave in this manner.

Dave Wallace, a staff architect in Yarbrough's department, mapped the cracks on a set of building plans on several occasions between March 28, 1977, and April 24, 1979. He first observed cracks on the north side of the building early in 1977. Later that year, he noticed similar cracks on the south side and marked all the cracks he saw in the plan book for the building. During 1977, Wallace also noticed deflection or sagging on the north side of the west block of the building and recorded it in the plan book. He associated this deflection with a horizontal crack; the rest of the cracks were "stairstep" and located in mortar joints.

Wallace mapped the cracks again in 1979 because he was curious to see if they had stabilized or if they were "still relieving stresses in the walls." One crack he had first noted on May 2,

1977, had extended 8 feet by April 24, 1979. Wallace observed several new stairstep cracks ranging in size from several inches to approximately 8 feet long. Because the cracks had lengthened between 1977 and 1979 and because Wallace found new cracks in 1979, he concluded that the cracking had not stabilized and that the conditions which originally caused the cracking were still present.

Yarbrough testified that Wallace had the right and authority to inspect the conditions in the college of pharmacy building and that if Wallace was concerned about the condition of the building, it was his responsibility to report that concern to Yarbrough. Wallace testified that, as an architect, he did not believe the condition of the college of pharmacy building was "an acceptable situation." He never expressed this concern to his superior, Yarbrough, because he was not asked. In any event, Yarbrough had been told by Money that Wilscam and Rudeen had determined that the cracks were superficial, and Yarbrough did not believe he had the authority to pursue a further investigation.

Erwin Welch, a UNMC construction coordinator, reviewed Wallace's map sometime prior to his deposition on May 6, 1986. He testified that he had seen the cracks in the building and thought it was unusual to find so many cracks in a new building in just 3 years.

As of September 15, 1980, UNMC had already spent $24,339 on general renovation or repairs on the building. In September 1980, the University requested $20,000 in special funding, with a priority rating of 27 out of 28 projects, for wall repairs of the college of pharmacy building. By September 1981, the cost of wall repairs was estimated at $25,000 and the request for special funding had advanced to priority 5 out of 21 projects. By March 1982, the University estimated it needed $30,000 from the University budget to repair the walls.

Yarbrough testified that he would not reasonably expect a building such as the college of pharmacy building to require $20,000 worth of raking and tuck-pointing within 4 years after it was completed and that in his experience the amount of repair costs was "very extraordinary."

Architect Charles Wilscam testified that, assuming the

building had been reasonably maintained, $20,000 in repair costs, which was the amount requested in 1980, would cause him to be concerned about defects or deficiencies in the building and would lead him to believe that there should be some investigation to determine the cause of cracking.

On June 7, 1982, John Colby joined the UNMC staff as a design engineer. On July 1, 1982, he was promoted to manager of architecture and engineering and became responsible for new construction and the renovation of existing buildings. Colby first observed the cracks in the college of pharmacy building on June 7 or 8, 1982, and subsequently reviewed Wallace's map. He considered the cracks to be serious and testified that had he seen the cracks in April 1979, he would have investigated the cause of cracking. Colby recommended, in August 1982, that a consultant be hired to determine the cause of cracking.

The University retained consulting engineers Shive-Hattery & Associates (Shive) in the fall of 1982 to determine the cause of cracking in the exterior walls of the building. Shive's structural engineer, Dale Moore, performed a site inspection on October 13 to 15, 1982. Shive's December 1, 1982, report concluded that the primary cause of the diagonal stairstep cracks was floor slab deflection. Shive recommended tuck-pointing all cracks in the existing masonry and installing vertical control joints and horizontal expansion joints to accommodate further movements in the structure. Shive did not attempt at that time to determine the cause of the floor slab deflection, but offered to provide further assistance in assessing "the question of responsibility or liability for the cracked conditions of the brick."

The University contracted with Western Waterproofing to do the repairs recommended by Shive, and repair work commenced in approximately August 1983. When Western Waterproofing removed portions of the brick facing, it discovered many construction defects in the brick walls. In one instance, a piece of the shelf angle fell out of the masonry and onto the scaffolding when Western Waterproofing attempted to install a horizontal control joint. The shelf angle had been cut with an acetylene torch and was not anchored to the building. Shive engineer Moore returned to the site in October 1983 and

observed several other construction defects. Moore recommended making more test openings and completing the initial repairs as soon as possible. As the repairs progressed, it became apparent that in many instances the veneer brick was not properly placed on the shelf angle; that some shelf angles had been put in upside down; and that in many places the brick ties had been attached in the wrong location. In other words, the brick veneer was not firmly attached to the building.

The University contacted Lueder about these problems, and in October 1983, Lueder hired Wiss,° Janney, Elstner Associates, Inc. (Wiss), a Chicago engineering firm, to investigate the building. Wiss performed a thorough investigation and reported to the University at a meeting on February 20, 1984, that the cracks in the walls were caused by extensive floor slab deflections. The Wiss report also alerted the University to the fact that the floor slabs had not been built according to plans and specifications and that the floors had a live load bearing capacity of only 25 to 30 pounds per square foot. The building had been designed with a live load bearing capacity of 100 pounds per square foot.

All of the consulting engineers who testified at trial had access to the building plans and specifications and Wallace's map of the cracking as it appeared in 1977 and 1979. Moore testified that in his opinion the cracks that existed in 1979 would warrant a measurement to determine whether floor slab deflection was the cause of the cracks.

Ian Chin, an engineer employed by Wiss, testified that there were clear signals back in 1977 as well as in 1979 that a thorough investigation of the cracking should have been performed. According to Chin, "[P]roperly designed and constructed masonry walls are not expected to develop these type of cracks." Chin testified that the pattern of cracking itself strongly indicated floor slab deflection and prompted him to analyze the drawings and discover the construction defects in the floor slabs. Chin further testified that a proper investigation also would have entailed making test openings in the walls to observe how the walls were constructed.

Structural engineer Eugene Holland testified that if he had been hired in 1979 to investigate, he would have suspected the

cracks were caused by defective design, lack of control joints, and/or improper construction by the contractor. Holland also testified that a comprehensive investigation was not warranted in 1977, but at that point, the University should have repaired the existing cracks and monitored the building for further cracking. By 1979, however, Holland would have suspected a strength problem and would have recommended a full investigation because of the appearance and number of cracks.

The applicable statute of limitations in this case is § 25-223, which provides in part:

> Any action to recover damages based on any alleged breach of warranty on improvements to real property or based on any alleged deficiency in the design, planning, supervision, or observation of construction, or construction of an improvement to real property shall be commenced within four years after any alleged act or omission constituting such breach of warranty or deficiency. If such cause of action is not discovered and could not be reasonably discovered within such four-year period, or within one year preceding the expiration of such four-year period, then the cause of action may be commenced within two years from the date of such discovery or from the date of discovery of facts which would reasonably lead to discovery, whichever is earlier.

Applying § 25-223, the district court determined that the act or omission in this case would date from October 11, 1976, the date of substantial completion. Since this action was not filed until more than 4 years after the date of substantial completion, the reasonable discovery provisions of § 25-223 apply, and the issue is whether the University could have discovered its cause of action before April 13, 1982, if it acted reasonably.

The district court found that from 1977 through 1980, the University was aware that the cracks in the college of pharmacy building were unusual in their number, size, and continued growth and that the investigation ordered by Colby in 1982 should have been done well before Colby was hired and decidedly before April 1982. The court specifically found that the condition of the building was such that a thorough investigation should have been initiated as early as 1980 and not later than 1981 and that a reasonable investigation at that time

should have included such examination and analysis so as to allow discovery of all of the University's causes of action.

Discovery, as applied to statutes of limitations, refers to the fact that one knows of the existence of an injury or damage and not that he or she has a legal right to seek redress in court. *Georgetowne Ltd. Part. v. Geotechnical Servs., ante* p. 22, 430 N.W.2d 34 (1988). Under the discovery principle, a cause of action accrues and the 2-year discovery provision of § 25-223 begins to run, when there has been discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery. *Georgetowne, supra.* It is not necessary that the plaintiff have knowledge of the exact nature or source of the problem, but only knowledge that the problem existed. *Kearney Clinic Bldg. Corp. v. Weaver,* 211 Neb. 499, 319 N.W.2d 95 (1982); *Grand Island School Dist. #2 v. Celotex Corp.,* 203 Neb. 559, 279 N.W.2d 603 (1979). The point at which a statute of limitations commences to run must be determined from the facts of each case, and the decision of the district court on the issue of statute of limitations will not be set aside by the Supreme Court unless it is clearly wrong. *Georgetowne, supra; Suzuki v. Holthaus,* 221 Neb. 72, 375 N.W.2d 126 (1985); *Interholzinger v. Estate of Dent,* 214 Neb. 264, 333 N.W.2d 895 (1983).

At this stage of the litigation, the issues tried to the district court pertained only to the statute of limitations, and not to the causes of the cracking itself. Although evidence presented by Lueder indicates that the cracking of the exterior brick walls of the college of pharmacy building may have been caused by design error, it is clear that the University employees responsible for maintaining the building were concerned about the cracking less than 1 year after the building had been completed. Adequate checking into the cracking problem would have led to the discovery of structural deficiencies. While the University may have been diligent in asking architects Wilscam and Rudeen to review the cracks at that time, the cracks continued to lengthen, widen, and increase in number. Walter Rudeen determined, in October 1977, that the large horizontal crack he investigated was caused by construction error. The building

required caulking quarterly or semiannually over a 5-year period. Money, Yarbrough, Welch, and Wallace all regarded the magnitude and pattern of cracking as unusual, yet none of them recommended that the cause of cracking be investigated by a disinterested party. Not until August 1982 did a new University employee, Colby, recommend that the building be investigated by Shive. Colby testified he would have called for investigation as early as 1979. It is clear that the diffusion of responsibility and the blurring of the lines of authority led to such inertia that no one in the University pushed a thorough investigation of these early problems in a brandnew, $2,800,000 building. Nonetheless, University personnel knew of the problem, and such knowledge becomes knowledge of the University. *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d 747 (1983).

Structural engineers Ian Chin and Eugene Holland testified that they too would have investigated the cracking problem as early as 1979. A competent investigation would have included making test openings in the walls and a structural analysis of the building. In any event, in 1980 the University requested $20,000 to repair the exterior walls of the college of pharmacy building, an amount Yarbrough described as "extraordinary." By 1981, this amount had risen to $25,000 and the wall repair project had risen from priority 27 to priority 5 on the funding request list. The University knew or should have known by that time that there was a problem with the building.

The district court was not clearly wrong in finding that the University should have investigated the cracking problem no later than sometime in 1981 and that a reasonable investigation at that time should have included such examination and analysis so as to have led to a discovery of all of the University's causes of action. This suit was filed on April 13, 1984, more than 2 years after the existence of facts which would have, if pursued, led to the discovery of the University's causes of action, and is barred by the applicable statute of limitations.

The decision of the district court is affirmed.

AFFIRMED.