EUGENE H. SHERBECK, APPELLANT, v. CARLOS E. SCHAPER, APPELLEE.

442 N.W.2d 364

Filed July 7, 1989.   No. 87-338.

Kent A. Schroeder, of Ross, Schroeder & Fritzler, for appellant.

D. Steven Leininger, of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, for appellee.

HASTINGS, C.J., CAPORALE, and GRANT, JJ., and BURKHARD and HANNON, D. JJ.

BURKHARD, D.J.

On October 25, 1985, the plaintiff, Eugene H. Sherbeck, filed a legal malpractice action against the defendant, Carlos E. Schaper, in the district court for Custer County, Nebraska. The defendant, at all times material herein, was an attorney engaged in the practice of law in Broken Bow, Nebraska.

The plaintiff, in his amended petition, alleges that the defendant performed legal services for him in connection with an installment sale of corporate stock agreement dated June 14, 1979. The plaintiff states that the defendant deviated from the standard of care applicable to attorneys under similar circumstances and failed to exercise the skill and knowledge ordinarily possessed by attorneys under similar circumstances. The thrust of the plaintiff's claim is found in three of the plaintiff's specifications of malpractice:

b. He failed to use reasonable care to assess and explain

the legal effect and ramifications of the "Installment Sale of Corporate Stock" contract subsequently dated June 14, 1979, when in the exercise of reasonable care he should have done so.

. . . .

f. He failed to advise the Plaintiff that the buyers could impair or substantially encumber all of the assets of the said corporation without the seller's consent and to his detriment when in the exercise of reasonable care he should have done so.

. . . .

h. He failed to advise the plaintiff that the legal effort [sic] of the "Installment Sale of Corporate Stock" subsequently dated June 14, 1979 was nothing more than an unsecured promissory note payable in installments, when in the exercise of reasonable care he should have done so.

The plaintiff claims he was damaged as a proximate result of the defendant's alleged professional negligence.

The defendant, in his answer, among other things denied that he was negligent in any manner and claimed that plaintiff's cause of action was barred by the applicable statute of limitations. Defendant's motion for summary judgment was heard on January 19, 1987, and was sustained by the district court on March 18, 1987, and plaintiff's amended petition was dismissed. We affirm the judgment of the district court.

The plaintiff was the sole owner of all 414 shares of stock in a corporation known as Sargent Livestock Commission Company, Inc. The principal business of the corporation was the operation of a sale barn in Sargent, Nebraska. The main assets of the corporation were real estate, fixtures, and improvements on the real estate amounting to about 43 acres.

Due to health problems, plaintiff considered selling his business. Lorry Marshall approached the plaintiff about purchasing the business. The plaintiff subsequently hired Marshall as a manager and allowed him time to arrange financing. Marshall found another investor named Gary Johnson. Because of income tax consequences, the plaintiff suggested a contract for sale rather than a straight cash

payment. Marshall and the plaintiff worked out the payment terms of the contract.

In May of 1979, the plaintiff asked the defendant for his help in arranging the sale of the business to Marshall and Johnson. To this end, the defendant drafted an installment sale contract for the sale of the plaintiff's 414 shares of capital stock in Sargent Livestock. Marshall conferred with his attorney, John Sennett, concerning the contract, and the defendant also conferred by phone with Sennett regarding the contract. The defendant then redrew the agreement in accordance with his conversation with Sennett as to the schedule of payments. The final draft of the agreement was prepared by Sennett. Sennett either gave copies of the agreement to Marshall "for him to deliver" or gave Marshall a copy and took a copy to the defendant.

The contract provided that the corporation's stock was to be held in escrow by Farmers State Bank and that after the downpayment of $30,000, payments were to be made monthly (for 9 months each year) for 10 years. The buyers were to have full voting rights in the stock. The contract did not give the plaintiff any kind of lien on the corporation's assets.

Before signing the final draft of the agreement, the plaintiff claims he took it to the defendant to check over. This was 2 days before the contract was signed. The plaintiff states he asked the defendant if he was "protected" by the agreement if the buyers did not make their payments, and the defendant, according to the plaintiff, responded, "It looks okay to me." The defendant, on the other hand, denies that he reviewed with the plaintiff the contract prepared by Sennett. The defendant claims he did not have an office conference or telephone conference with the plaintiff before the plaintiff signed the agreement in its final form. Plaintiff, who had a high school education, read the contract before he signed it, but apparently did not understand it. The plaintiff felt that if there was a problem, his attorney would have told him about it. On June 14, 1979, the plaintiff and the buyers, Marshall and Johnson, signed the final draft of the installment sale agreement.

In July 1984, the plaintiff, having just gone through a divorce in which he was represented by Richard Anderson, an

attorney in Kearney, Nebraska, asked Anderson to look into the possibility of selling plaintiff's interest in the sale barn contract. Payments were made under the terms of the agreement until September 1984, when the buyers did not make the agreed payment. Anderson checked the real estate that the plaintiff was selling under the agreement. It was discovered that the agreement of June 14, 1979, had not been filed and that there were three mortgages on the real estate that had been given by the corporation, Sargent Livestock. The mortgages were on file with the register of deeds in Custer County, Nebraska. These were to Basil O. Marshall and Wanda E. Marshall, recorded October 24, 1983; Security State Bank, recorded April 24, 1984; and Lorry Marshall and Marlene K. Marshall, recorded April 24, 1984. The plaintiff testified that he first became aware of these mortgages between the 15th and 20th of October 1984, in a conversation with Anderson. The plaintiff testified that he was "surprised" when he learned from Anderson of the existence of these mortgages, and specifically stated as follows:

Q- What did Mr. Anderson tell you?

A- He said, "Did you know of big mortgages against Sargent Livestock Commission Company?" I said, "No."

Q- What was your reaction to that information?

A- How they could do it.

Q- What did you do after they told you that?

A- I said my September payment is past due. And he advised me to go to Gary Washburn.

Q- Did you believe at that point that there was a violation of the contract?

A- I never believed there was a violation until the September payment was defaulted.

Q- Well, you said that this information that Mr. Anderson gave you surprised you, didn't you?

A- Yes.

Q- Why did it surprise you?

A- Because, according to the contract, I didn't know that they could do that.

. . . .

Q- When Mr. Anderson told you about these

mortgages, your understanding of the contract at that time was that they couldn't do that; is that a fair statement?

A- Yes.

Anderson confirms that the meeting between himself and the plaintiff took place on October 19, 1984, at Anderson's office in Kearney. The meeting lasted approximately 2 hours. Anderson had been told by his secretary on October 18, 1984, of the presence of the aforementioned three mortgages on the property. The secretary prepared a memorandum setting forth the three mortgages. Upon learning of the mortgages, Anderson immediately called the plaintiff on October 18. The reason for the immediacy of the situation is described by Anderson as follows:

Q- And did you at that point that you asked your secretary to get a hold of Mr. Sherbeck, perceive some problems with the Installment Sale Contract?

. . . .

A- Yeah, I thought there were some problems with it.

Q- What were they?

A- Well, I wasn't completely sure, but I was concerned about whether some of the subsequent liens might hold a priority to his interest in the contract.

Among the matters discussed at the meeting were the mortgages on the property and plaintiff's lack of priority as against those mortgages. Specifically, Anderson told the plaintiff at the October 19, 1984, meeting the following:

Q- And to the best of your recollection Mr. Anderson, would you tell the Court what you discussed with your client on that date?

Q- The client being Mr. Sherbeck.

A- To be honest with you I don't know the particulars. I'm sure I advised him of the other security interests and his lack of priority as against the real property. I'm sure we discussed various possible alternatives to salvage—strike that—to correct the problem. And I just—I can't tell you what all was said. I know we talked about the prior history of the contract and I know we talked about the potential, again, of selling his interests out.

Q- Specifically, did you discuss with Mr. Sherbeck the information contained in Exhibit No. 7? [Memo regarding mortgages against the property.]

A- I'm sure I did because that was my initial purpose with meeting.

. . . .

Q- During the course of the conversation with Mr. Sherbeck, did you tell him that the liens and the presence of the liens that you have set forth in Exhibit 7, appear to be in conflict with his Installment Sale Contract?

. . . .

A- I believe what I told him was that at least with reference to the real property governed by the Installment Sales Contract, they represented interests recorded prior in time to any interests that he might have had.

Q- And I take it you indicated that you thought he had a problem at least?

A- I did.

Also, Anderson's bill to the plaintiff on October 31, 1984, shows, in part, the following entry for October 19, 1984: "Confer with client re: problems connected with the filing of prior liens. Research all prior liens, etc. . . ."

It is undisputed from these facts that the plaintiff knew on October 19, 1984, that he had a serious problem with the contract and that there were mortgages ahead of his interest in the contract.

Following the meeting with Anderson on October 19, 1984, the plaintiff went to see Gary Washburn, an attorney in Broken Bow, about foreclosing on Marshall and Johnson. Washburn testified that he could not be exactly certain, but that his records indicate this meeting occurred most likely on October 24, 1984. Washburn, after doing some checking, called the plaintiff on or about October 29, 1984, and told the plaintiff "that in my opinion I thought he had some problems with [the contract]." Washburn wrote the plaintiff a letter on November 1, 1984, and said, "As I told you on the phone, I feel that this Installment Sale gives you very little protection and that in fact you stand a good chance of being subsequent to Security State Bank of Broken Bow, in so far as their mortgage is concerned."

Thereafter, substantial litigation occurred between the plaintiff and Security State Bank and others regarding priority of the liens against the installment contract real estate. On December 10, 1984, the Security State Bank filed a foreclosure action in the district court for Custer County, Nebraska, involving the real estate that was owned by Sargent Livestock and which was involved in the June 14, 1979, sale of stock from the plaintiff to Marshall and Johnson. The plaintiff in this action was one of the named defendants in the foreclosure action. Trial on the foreclosure action was held on September 26, 1985. A decree of foreclosure was entered on October 16, 1985, although the "Certificate of Service" stamp on the decree states that "a copy hereof was mailed" to the attorneys of record (including Gary Washburn, plaintiff's attorney) on September 27, 1985. In any event, the foreclosure decree provided in part that "[d]efendant Eugene Sherbeck has no interest in, lien, right or title to the mortgaged premises."

A motion for summary judgment shall be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Neb. Rev. Stat. § 25-1332 (Reissue 1985). In reviewing a summary judgment, this court must take the view of the evidence most favorable to the party against whom the motion is directed and give that party the benefit of all favorable inferences which may be drawn from the evidence. Summary judgment is an extreme remedy to be awarded only when the issue is clear beyond all doubt. *Muller v. Thaut*, 230 Neb. 244, 430 N.W.2d 884 (1988).

The applicable statute of limitations for legal malpractice is Neb. Rev. Stat. § 25-222 (Reissue 1985), which provides in part as follows:

Any action to recover damages based on alleged professional negligence . . . in rendering or failure to render professional services shall be commenced within two years next after the alleged act or omission in rendering or failure to render professional services providing the basis for such action; *Provided*, if the cause of action is not discovered and could not be reasonably

discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier . . . .

Assuming, but not deciding, that the 2-year provision in the above statute is not applicable to this case, When did the plaintiff discover the alleged negligent acts of the defendant, or at least discover facts which would reasonably lead to such discovery, so as to bring into play the 1-year provision of the above statute? The answer is October 19, 1984. It was on that date that the plaintiff was advised by Anderson of the three mortgages on the real estate involved in the June 14, 1979, transaction, and this surprised the plaintiff "[b]ecause, according to the contract, I didn't know that they could do that." Anderson was sure that he advised the plaintiff as to plaintiff's "lack of priority as against the real property," and believes he told the plaintiff that the three liens "represented interests recorded prior in time to any interests that he [plaintiff] might have had." Anderson also indicated to the plaintiff that he thought the plaintiff "had a problem at least."

Discovery, as applied to statutes of limitations, refers to the fact that one knows of the existence of an injury or damage and not that he or she has a legal right to seek redress in court. A cause of action accrues, and the statute of limitations begins to run, when there has been discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.

*Georgetowne Ltd. Part. v. Geotechnical Servs.*, 230 Neb. 22, 26, 430 N.W.2d 34, 37 (1988). "It is not necessary that the plaintiff have knowledge of the exact nature or source of the problem, but only knowledge that the problem existed." *Board of Regents v. Lueder Constr. Co.*, 230 Neb. 686, 696, 433 N.W.2d 485, 491 (1988).

The plaintiff, on October 19, 1984, knew of the three mortgages on the real estate and his lack of priority, and we conclude, as a matter of law, that these facts were sufficient to

put the plaintiff on such inquiry which, if pursued, would lead to the discovery of the alleged negligence of the defendant. There is no genuine issue as to any material fact. Plaintiff's suit was not filed until October 25, 1985, which was beyond the 1-year statute of limitations. The judgment of the district court is therefore affirmed.

AFFIRMED.