BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA,
APPELLANT, V. WILSCAM MULLINS BIRGE, INC., DEFENDANT AND
THIRD-PARTY PLAINTIFF, AND WALTER D. RUDEEN AND
ASSOCIATES, INC., THIRD-PARTY DEFENDANT, APPELLEES.

433 N.W.2d 478

Filed December 23, 1988.   No. 87-370.

Gerald P. Laughlin and Jill Robb Ackerman, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellant.

Steven J. Riekes, of Richards, Riekes, Brown & Zabin, P.C., for appellee Wilscam Mullins Birge.

BOSLAUGH, SHANAHAN, and GRANT, JJ., and ENDACOTT and QUIST, D. JJ.

GRANT, J.

On April 13, 1984, the Board of Regents of the University of Nebraska (University) filed this action against architects Wilscam Mullins Birge, Inc. (Wilscam), for damages suffered due to alleged design deficiencies and negligent supervision and inspection of construction of the college of pharmacy building at the University of Nebraska Medical Center (UNMC) in Omaha. The petition alleged Wilscam negligently designed the building by failing to allow for deflection of the floor slabs, negligently inspected the contractor's work by failing to detect deviations from the plans and specifications during construction, negligently approved defective shop drawings and allowed the contractor to construct the floor slabs according to the erroneous shop drawings, and negligently failed to design floor slabs that would meet design loading criteria. Wilscam filed a third-party action against Walter D. Rudeen and Associates, Inc. (Rudeen), in connection with the preparation or approval of the allegedly defective shop drawings. The district court held that Wilscam's cause of action against Rudeen did not accrue until Wilscam's liability to the University became fixed. No appeal has been taken on this issue.

The trial was bifurcated, pursuant to Neb. Rev. Stat. § 25-221 (Reissue 1985), to determine the issues related to Wilscam's statute of limitations defense, and all the parties agreed that the matter should be tried to the court without a jury. The district court for Douglas County held that the action was one for professional negligence and was barred by Neb. Rev. Stat. § 25-222 (Reissue 1985).

The University timely appealed and, in this court, sets out four assignments of error, alleging the district court erred in holding (1) that § 25-222 was the applicable statute of limitations; (2) that the statute of limitations for all causes of action began to run no later than December 1, 1982; (3) that the second cause of action was barred because the brick tie, angle iron attachment, and brick placement on the support shelf problems were problems distinct from the cracking brick problem and its causes; and (4) that the third and fourth causes of action were barred by the statute of limitations because the

structural weight-bearing defect was separate and distinct from the cracking brick problem and its causes. We affirm.

On the same date of April 13, 1984, the University filed a separate action against Lueder Construction Company (Lueder), general contractor for the project. That action is the subject of the succeeding opinion, *Board of Regents v. Lueder Constr. Co., post* p. 686, 433 N.W.2d 485 (1988). Much of the evidence in the two cases was the same or similar (indeed, the testimony in this case was incorporated in the *Lueder* case), but different statutes are involved and separate trials were held, so the two actions will be considered separately.

The record shows that on May 6, 1974, the University and Wilscam entered into a contract in connection with the construction of a new college of pharmacy building at UNMC. The contract required Wilscam to provide design services and, during the construction of the building, to perform periodic site inspections to determine whether the work was proceeding in accordance with the contract documents. The contract also required Wilscam to review and approve shop drawings for conformance with Wilscam's design concept and for compliance with the contract documents. In 1975, Wilscam hired Rudeen to perform the structural engineering design work for the project. The University retained Lueder as general contractor.

The college of pharmacy building consists of east and west "pods" separated by an atrium. The structural system consists of reinforced concrete floor slabs and structural steel columns. The floor slabs are reinforced with posttension strands and support a brick masonry veneer wall. The building was substantially completed on October 11, 1976, and accepted by the University on that date.

During the year following that completion, University personnel monitored the new building for deficiencies. George Money, director of planning and construction at UNMC, prepared a "punch list" of these items thought to be deficient to be reviewed by Wilscam and Lueder. Money's department was responsible for the building during 1977 because the building was still subject to Lueder's 1-year construction warranty. The punch list, dated September 27, 1977, refers to several instances

of brick cracking in the south wall, a missing mortar joint on the east wall, bricks "broken out" on the north side, and cracking of brick in the west end of the atrium. The deficiencies were set out in the punch list as follows:

24. South wall has a crack at the east end of the west window, starting at the window sill and going up about half the window height, coming up about seven blocks (about half way up).

25. The overhang at the south wall west end. There is a crack that starts in the corner third brick up and then goes to the west up to the eighth brick.

26. Another crack on the south wall west side of the attrium [sic] that is up 18 blocks above the start of square block and over six blocks. Mortar joint missing on the east wall fifth course above the dock head about two blocks west of the television camera.

. . . .

28. On the north side the brick is broken out the fourth row down from the square brick course on the west end of the atrium. The west end of the atrium up five of the square brick crack starts and goes over half brick and then up the tile over the next joint. Goes on up about eight or nine courses.

Representatives of Wilscam, Lueder, and the University met on the UNMC campus to conduct a 1-year review of the building. They discussed unresolved punch list items, including those listed above. In October 1977, structural engineer Walter Rudeen and Wilscam's field architect, Frederick Fast, reviewed the brick cracking referred to in the punch list. Rudeen determined that a horizontal crack on the north side had been caused by the deflection of an angle bracket. Neither Wilscam nor Rudeen reported to the University about the several instances of diagonal "stairstep" mortar cracking which had been drawn to Wilscam's attention during the 1-year review meeting. Wilscam and Rudeen discovered no structural defects in 1977. Wilscam reported the results of Rudeen's investigation to Money and recommended only that the cracks be patched or caulked to prevent further damage to the walls. Money directed Wilscam to have Lueder examine and repair the cracks.

Although Lueder caulked some of the more accessible cracks (those which did not require scaffolding), it did not complete the building repairs noted in the punch list.

Ralph Yarbrough was director of plant operations from July 1977 to July 1982. That department was in charge of maintenance of UNMC buildings. Yarbrough hesitated to direct his staff to repair the cracks because he considered them to be punch list deficiencies covered by Lueder's 1-year warranty on the building, and were Money's responsibility. Dave Wallace, a staff architect in Yarbrough's department, testified that there was "friction" between Yarbrough and Money over Yarbrough's reluctance to assume maintenance responsibility for the college of pharmacy building. During 1978, however, it became apparent that Lueder would not repair the cracks, and Yarbrough's department gradually assumed full responsibility for patching the cracks in the college of pharmacy building. Yarbrough testified that these cracks lengthened, widened, and increased in number to such an extent that the building required caulking quarterly or semiannually over a 5-year period, from 1978 to 1982. By 1982, neither Lueder nor the University had caulked any of the cracks that required scaffolding.

University staff architect Wallace mapped the cracks in the walls on several occasions between March 28, 1977, and April 24, 1979. Wallace first observed cracks on the north side of the building early in 1977. Later that year, he noticed similar cracks on the south side and marked all the cracks he saw in the plan book for the building. During 1977, Wallace also noticed deflection or sagging on the north side of the west block of the building and recorded it in the plan book. He associated this deflection with a horizontal crack. The rest of the cracks were "stairstep" and located in mortar joints.

Wallace mapped the cracks again in 1979 because he was curious to see if they had stabilized or if they were "still relieving stresses in the walls." One crack he had first noted on May 2, 1977, had extended 8 feet by April 24, 1979. Wallace observed several new stairstep cracks ranging in size from several inches to approximately 8 feet long. Because the cracks had lengthened between 1977 and 1979 and because Wallace found

new cracks in 1979, he concluded that the cracking had not stabilized and that the conditions which originally caused the cracking were still present. Wallace testified that, as an architect, he did not believe the condition of the college of pharmacy building was "an acceptable situation." He never expressed this concern to his superior, Yarbrough, because he was not asked.

Yarbrough himself testified that he felt the extent of cracking of the building was "an unusual situation" and that it was the "[f]irst and only building I've seen do it." Nevertheless, between 1977 and 1982, he never inquired as to the cause of cracking or expressed any concern about it because Money had told him in 1977 that Wilscam had investigated the problem and determined that the cracks were superficial.

John Colby joined the UNMC staff in June 1982 as a design engineer under Wallace. On June 7 or 8, 1982, Wallace pointed out to Colby the cracking problem at the college of pharmacy. In July 1982, Colby was promoted to manager of architecture and engineering, reporting to Yarbrough. Colby regarded the cracking as a serious problem and soon recommended to Yarbrough that the cause of cracking be investigated by professional engineers.

Pursuant to Colby's recommendation, the University hired a consulting structural engineering firm, Shive-Hattery & Associates (Shive), to determine the cause of cracking. Shive's engineers performed a field investigation in October 1982, which entailed crack location identification, a visual examination of cracks, relative elevation measurements, and examination of steel lintels and steel stud backup walls. Shive's December 1, 1982, report to the University concluded that certain diagonal cracks were "primarily due to deflections of the post tensioned concrete floor slabs" and that horizontal cracks in the south wall of the fifth level "may be due, in part, to the lack of lateral load resistant capabilities of the structural frame . . . ." The report further concluded that cracking in the east elevation had developed due to thermal and moisture movements, aggravated by a lack of expansion joints. Shive also concluded that certain other cracks would have been significantly reduced had additional control or expansion joints

been installed during construction. Shive's engineer, Dale Moore, testified that Shive did not attempt at that time to determine the cause of the floor slab deflection, but only the cause of cracking.

Shive expected the floor slab deflection to continue and anticipated further cracking due to thermal and moisture conditions. It recommended that repair procedures include tuck-pointing the cracks in the mortar joints and constructing vertical control joints and horizontal expansion joints to absorb thermal and moisture movements and possible minor structural movements. In the concluding paragraph of the report, Shive offered to provide further assistance in assessing "the question of responsibility or liability for the cracked conditions of the brick."

After receiving the Shive report, the University determined to do the repairs recommended by Shive. After competitive bidding, the University contracted with Western Waterproofing to make the repairs. Repairs commenced in the summer of 1983. At this time, portions of the brick veneer were removed, and the University discovered the exterior brick walls and supporting structure had not been installed according to plans and specifications. Specifically, metal ties were improperly installed; supporting angle irons were not attached to the building; and the brick veneer was not properly set on the supporting angle irons. The University contacted both Wilscam and Lueder about these construction defects.

In the fall of 1983, Lueder hired consulting engineers Wiss, Janney, Elstner Associates, Inc. (Wiss), to determine the cause of cracking. Wiss concluded that "neither the problems with the installation of the shelf angle [nor] the misalignment of the metal ties contributed to the observed brickwork cracking." Rather, the cracks were caused by extensive floor slab deflections and a lack of vertical control and horizontal expansion joints. The Wiss report dated February 17, 1984, further alerted the University to the fact that the floor slabs of the building had not been built according to plans and specifications and had a live load bearing capacity of only 20 to 25 pounds per square foot. The building had been designed with a live load bearing capacity of 100 pounds per square foot. Wiss

recommended that its findings be confirmed, and on April 27, 1984, Shive confirmed the Wiss analysis.

Ian Chin, an architect and structural engineer employed by Wiss, testified that the building design itself, together with the diagonal pattern of cracking in the walls, strongly suggested the cracks were caused by floor slab deflection. Chin stated that checking the floor strength was not part of his initial assignment, but was an "evolution" of his initial assignment to determine the cause of cracking. He further testified that a strength analysis could have been done in 1977.

Structural engineer Eugene Holland, who was retained by counsel for Wilscam to assist in defending this action, also testified that to investigate a building, the engineer should make a visual inspection and map any cracks. The engineer should then determine the material strengths of brick, mortar, floor slabs, and steel, and connections of masonry. It also is necessary to review the construction drawings, architectural structural drawings and specifications, and shop drawings to see how the building was put together. In particular, the investigating engineer should examine the floor to investigate wall cracks because "[t]he two elements are inter-related. The wall is supported by the floor. . . . And therefore, anything that is distressed in the wall would be projected to the floor possibly."

The University first contends that the district court erred as a matter of law in applying § 25-222, containing a 2-year statute of limitations for professional negligence, rather than Neb. Rev. Stat. § 25-223 (Reissue 1985), which sets out a 4-year limitation period, to the facts of this case. Our decisions in *Witherspoon v. Sides Constr. Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985), and *Williams v. Kingery Constr. Co.*, 225 Neb. 235, 404 N.W.2d 32 (1987), are dispositive of this issue. Section 25-222 specifically pertains to "actions on professional negligence." Both *Witherspoon* and *Williams* hold that architects and engineers are professionals for the purposes of § 25-222. Furthermore, "A professional act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than

physical or manual." *Witherspoon v. Sides Constr. Co., supra* at 125, 362 N.W.2d at 42. The allegations stated in the petition clearly involve professional acts contemplated by § 25-222, see *Williams v. Kingery Constr. Co., supra,* and the district court acted properly in applying that section.

Section 25-222 provides:

> Any action to recover damages based on alleged professional negligence or upon alleged breach of warranty in rendering or failure to render professional services shall be commenced within two years next after the alleged act or omission in rendering or failure to render professional services providing the basis for such action; *Provided,* if the cause of action is not discovered and could not be reasonably discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier . . . .

Section 25-222 also sets forth a 10-year period of repose for actions involving professional negligence. The period of repose applicable to an architect who has a duty to inspect throughout construction under the provisions of § 25-222 begins to run when the construction is completed. *Williams v. Kingery Constr. Co., supra; Witherspoon v. Sides Constr. Co., supra.* Similarly, the 2-year statute of limitations under § 25-222, applicable to an architect who has the responsibility to design a building and a duty to inspect throughout construction, begins to run when the construction is completed. If a plaintiff, however, proves by a preponderance of the evidence that the cause of action was not discovered and could not reasonably have been discovered within such a 2-year period, then an action may be commenced "within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier . . . ." § 25-222.

Since this action was filed on April 13, 1984, more than 2 years after the date of substantial completion of the building on October 11, 1976, the determinative issue is whether the University discovered or could reasonably have discovered it

had a cause of action, or could reasonably have discovered facts which would have led to such discovery, on or before April 13, 1983. The trial court held that the University "knew or reasonably should have known of facts which would have led to the discovery of the alleged negligence of the defendant by December 1, 1982 at the latest."

Discovery, as applied to statutes of limitations, refers to the fact that one knows of the existence of an injury or damage and not that he or she has a legal right to seek redress in court. *Georgetowne Ltd. Part. v. Geotechnical Servs., ante* p. 22, 430 N.W.2d 34 (1988). Under the discovery principle, a cause of action accrues and the 1-year discovery provision of § 25-222 begins to run, when there has been discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery. *Georgetowne, supra.* It is not necessary that the plaintiff have knowledge of the exact nature or source of the problem, but only knowledge that the problem existed. *Kearney Clinic Bldg. Corp. v. Weaver,* 211 Neb. 499, 319 N.W.2d 95 (1982); *Grand Island School Dist. #2 v. Celotex Corp.,* 203 Neb. 559, 279 N.W.2d 603 (1979). The point at which a statute of limitations commences to run must be determined from the facts of each case, and the decision of the district court on the issue of statute of limitations will not be set aside by the Supreme Court unless it is clearly wrong. *Georgetowne, supra; Suzuki v. Holthaus,* 221 Neb. 72, 375 N.W.2d 126 (1985); *Interholzinger v. Estate of Dent,* 214 Neb. 264, 333 N.W.2d 895 (1983).

The record shows that cracks were discovered in the walls of the college of pharmacy building as early as April 1977. University personnel observed and monitored the cracks as they increased in length, width, and number between 1977 and 1982. In the summer of 1982, Colby, a new University employee, was sufficiently concerned about the cracking that he recommended hiring Shive to investigate the problem. On December 1, 1982, Shive reported to the University that the cracks were caused by deflection of the floor slabs and made its recommendations for repairs. Shive's structural engineer

testified that if the University had asked him in 1982 to inspect the building as to its structural strength, he could have done so and would have reached the same conclusions reached by Wiss on February 17, 1984. In fact, the University declined Shive's offer to assess "the question of responsibility or liability for the cracked conditions of the brick."

Both Wiss engineer Chin and structural engineer Holland testified that as early as 1979, if called upon to determine the cause of cracking, they would have conducted a more extensive investigation than did Shive and would have discovered the defects now complained of. Even assuming that the cracking problem was not caused by deviations from plans and specifications in the construction of the brick walls and that the cracking problem was not caused by any structural weight-bearing defect, a thorough and timely investigation of the cracking problem should have led to the discovery of all the building defects complained of here before April 13, 1983. A thorough investigation of the cracking would have revealed the many construction defects which allegedly slipped through Wilscam's fingers during construction and would have required a review of the building plans and the shop drawings in conjunction with a strength analysis.

We agree with the district court that, in addition to the early appearance of the cracks with 5 months of the completion of the building and the unusual magnitude, persistence, and enlarging of the cracks, the report by Shive on December 1, 1982, should have alerted the University to the fact it had serious problems with the college of pharmacy building.

While we determine there was more than sufficient evidence to support the trial court's finding that the University "knew or reasonably should have known of facts which would have led to the discovery of the alleged negligence of the defendant by December 1, 1982 at the latest," we note that there was other extremely strong evidence showing that the University was aware, more than 1 year before the filing of the petition in this case on April 13, 1984, that it had a potential claim against Wilscam.

There is evidence that the University considered filing suit against Wilscam and Lueder early in April 1983. Colby testified

that notes of his April 12, 1983, telephone conversation with Robert Pazderka, a civil engineer who was assistant vice president and director of facilities, indicate that Pazderka met with counsel for the University (not present counsel) on Monday, April 11, 1983, to discuss the college of pharmacy building. Colby's notes specifically refer to Pazderka's discussion with counsel on April 11, 1983, of statutes of limitations, concerning, in part, "2 year professional liability," "4 year contractor liability," and "1 year after discovery." The University was clearly aware of facts which might lead to a lawsuit at the absolute latest on April 11, 1983, and, indeed, was apparently considering the filing of a lawsuit on that date.

The district court was not clearly wrong in finding that the University knew, or reasonably should have known, by December 1, 1982, of facts which would lead to the discovery of the alleged negligence of Wilscam, and the University's assignments of error are without merit. Since this action was not filed until April 13, 1984, it is barred by the applicable statute of limitations, § 25-222. The decision of the district court is affirmed.

AFFIRMED.