LINDSAY MANUFACTURING COMPANY, A CORPORATION, APPELLANT AND CROSS-APPELLEE, V. UNIVERSAL SURETY COMPANY, A CORPORATION, APPELLEE AND CROSS-APPELLANT. LINDSAY MANUFACTURING COMPANY, A CORPORATION, APPELLANT AND CROSS-APPELLEE, V. BRUCE GILMORE & ASSOCIATES, INC., APPELLEE AND CROSS-APPELLEE, AND CHRISTIANSEN CONSTRUCTION COMPANY, A CORPORATION, AND LAYNE-WESTERN COMPANY, INC., APPELLEES AND CROSS-APPELLANTS.

519 N.W.2d 530

Filed July 29, 1994.   Nos. S-91-703, S-91-704.

496

Ronald F. Krause and Michael K. Huffer, of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Thomas J. Walsh, Sr., of Walsh, Fullenkamp & Doyle, for appellees Universal Surety Co. and Christiansen Construction Co.

Larry E. Welch and Christopher J. Tjaden, of Gross & Welch, P.C., for appellee Bruce Gilmore & Associates, Inc.

Waldine H. Olson and K.C. Engdahl, of Schmid, Mooney & Frederick, P.C., for appellee Layne-Western Co.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

LANPHIER, J.
Lindsay Manufacturing Company (Lindsay) appeals the

judgment of the district court for Platte County following a jury trial. Lindsay sought to recover costs incurred by it in remediating contamination of an aquifer underlying Lindsay's manufacturing plant. Lindsay claimed the contamination resulted from the improper construction of a new acid waste treatment facility (facility). Each defendant received judgment in its favor. Causes of action against Bruce Gilmore & Associates, Inc. (Gilmore), the engineering firm hired by Lindsay to design and oversee the construction of the facility, were dismissed by the district court as time barred by the statute of limitations. Although Lindsay asserted multiple causes of action against Christiansen Construction Company (Christiansen), the contractor hired by Lindsay to build the facility, the only action to reach the jury was breach of contract. Likewise, the only action to survive against Layne-Western Company, Inc. (Layne-Western), the subcontractor who dug the monitoring wells which are the subject of this litigation, was an action for negligence. The district court properly determined that the actions against Gilmore were time barred. Although the district court erred in failing to grant Christiansen's and Layne-Western's motions for directed verdict at the close of all evidence, the judgment of the district court rendered in favor of Christiansen and Layne-Western was proper. The liability of Universal Surety Company, the surety for Christiansen, is dependent upon the liability of Christiansen. We, therefore, affirm.

## BACKGROUND

Lindsay manufactures galvanized center-pivot irrigation equipment. As a part of the galvanization process, components are cleaned in a sulfuric acid solution. When the solution loses its effectiveness it is called spent pickle liquor (SPL). Lindsay disposed of the SPL, a hazardous waste, by draining it into an unlined earthen lagoon. After this practice became illegal, Lindsay sought to construct a new disposal facility.

Lindsay retained and contracted with Gilmore in 1982 to provide design and engineering services and to prepare the plans, specifications, and contract documents for the design and construction of the new facility. Gilmore designed the new

facility and prepared plans and specifications which were submitted to and approved by the Nebraska Department of Environmental Control.

On December 6, 1982, Lindsay entered into a contract with Christiansen to construct the facility using the plans and specifications prepared by Gilmore. The plans called for the installation of two lined reservoirs, or impoundments, and four monitoring wells.

The monitoring wells were required to detect leakage from the new SPL impoundments. The monitoring wells were originally designed to be 110 feet deep, but later the depth was changed. The borehole was to have a 10-inch diameter. After the borehole was dug, PVC pipe 4 inches in diameter was to be inserted into the middle of the hole. All but the top 3 feet of the space in between the pipe and the wall of the hole, referred to as the "annular space," was to be filled with road gravel. The last 3 feet of the annular space was to be filled with bentonite clay.

Christiansen orally subcontracted with Layne-Western to do the actual digging and installation of the monitoring wells. Layne-Western dug and installed the monitoring wells during the period of December 15 to 21, 1982.

Prior to the drilling of the wells, the aquifer was tested for contamination, but none was detected. The wells were drilled between December 15 and 21. On December 16, the aquifer was tested again and found to be contaminated. Gilmore alleges that on January 1, 1983, all of its work with the monitoring wells was complete. On September 25, 1984, Lindsay was informed that deterioration of the aquifer was accelerated by the introduction of the wells. On July 15, 1985, Gilmore certified that the entire construction project was complete. Lindsay contends that it was not until June 12, 1986, that it was informed that contamination was due solely to the wells. Lindsay filed its initial petition on December 11, 1986.

Most of the evidence adduced at trial was directed at establishing how the leakage into the aquifer occurred. It is undisputed that some of the contamination of the underlying aquifer was caused by leakage from one level of the aquifer to another through the annular spaces of the monitoring wells. Also, experts on both sides concluded that the disposal of the

SPL into the unlined pit caused some contamination of the aquifer prior to the introduction of the monitoring wells.

The district court granted summary judgment in favor of Gilmore, which had claimed that Lindsay's causes of action were time barred by the statute of limitations.

At the close of Lindsay's case, the court sustained the defendants' motions to dismiss each cause of action except for the cause of action against Layne-Western for negligence and part of Lindsay's action against Christiansen for breach of contract. The defendants' motions for directed verdict were overruled. At the close of all evidence, the defendants moved to dismiss the remaining causes of action. The motions were sustained in part. The defendants renewed their motions for directed verdict, but the motions were overruled.

After the ruling on the foregoing motions, Lindsay's remaining allegations against Christiansen were that Christiansen breached its contract (1) in failing to fulfill and comply with the plans and specifications and contract documents of the facility; (2) in not performing the contract monitoring wells' installation pursuant to the best known workmanship; and (3) in not performing its work and services in a skillful, careful, diligent, and workmanlike manner.

Lindsay's remaining allegation against Layne-Western was that Layne-Western was negligent (1) in "failing to adequately and properly design, select and install proper and sufficient materials, drill, fabricate, assemble and install the ground water monitoring wells for their intended use"; (2) in failing to adequately and properly investigate, examine, inspect, sample, test, analyze, and study the subsurface soil and hydrogeological conditions on the premises; (3) in failing to consult with, retain, or engage the services of a trained, qualified, and competent hydrogeologist regarding the subsurface soil and hydro-geological conditions at the premises; (4) in failing to perform its work in a reasonably good and workmanlike manner; (5) in failing to warn and notify Lindsay of the risk and danger of pollution and contamination of aquifer and ground water that would result from the manner and materials that Layne-Western used in installation of the ground water

monitoring wells; and (6) in failing to provide and install the proper and sufficient materials in the ground water monitoring wells in compliance with the applicable federal laws and industry standards.

After a trial on these remaining causes of action, the jury returned a verdict for the defendants.

## ASSIGNMENTS OF ERROR

Lindsay's 34 assignments of error, as summarized, assert that the district court erred (1) in finding that Lindsay's causes of action against Gilmore were time barred and in granting Gilmore's motion for summary judgment on that basis; (2) in instructing the jury to the effect that Gilmore was an agent of Lindsay and that Gilmore's negligence was attributable to Lindsay; (3) in instructing the jury so that tort defenses were applied to contract claims; (4) in instructing the jury that Christiansen's only duties under contract were to follow the plans and specifications contained therein; (5) in naming the dismissed party, Gilmore, in the caption of the instructions; (6) in failing to instruct the jury on the law concerning a nonparty, involved third person; (7) in allowing a document admitted for a limited purpose to be subsequently used for other purposes without the repetition of precautionary statements to the jury; (8) in not admitting evidence on a routine business practice of Layne-Western offered to show Layne-Western's negligence; (9) in failing to instruct the jury that digging near a hazardous waste lagoon is an ultrahazardous activity; (10) in striking from Lindsay's petition particulars plead with respect to Christiansen's breach of contract; (11) in failing to instruct the jury concerning efficient intervening cause with regard to Lindsay's case; (12) in submitting as a particular of contributory negligence the concept of mitigation of damages; and (13) in failing to submit to the jury a verdict form which would allow the jury to hold both Layne-Western and Christiansen liable.

Both Layne-Western and Christiansen cross-appeal and assign as error the overruling of their respective motions for directed verdict at the close of all evidence.

## STANDARD OF REVIEW

In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Zwingman v. Kallhoff*, 244 Neb. 514, 507 N.W.2d 894 (1993); *Murphy v. Spelts-Schultz Lumber Co.*, 240 Neb. 275, 481 N.W.2d 422 (1992); *Spittler v. Nicola*, 239 Neb. 972, 479 N.W.2d 803 (1992). Moreover, summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Zwingman v. Kallhoff, supra*; *Murphy v. Spelts-Schultz Lumber Co., supra*; *Moore v. Hartford Fire Ins. Co.*, 240 Neb. 195, 481 N.W.2d 196 (1992); *Barelmann v. Fox*, 239 Neb. 771, 478 N.W.2d 548 (1992).

A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted. After the moving party has shown facts entitling it to a judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents judgment as a matter of law for the moving party. *Murphy v. Spelts-Schultz Lumber Co., supra*; *Spittler v. Nicola, supra*; *Flamme v. Wolf Ins. Agency*, 239 Neb. 465, 476 N.W.2d 802 (1991).

It is a well-settled rule in this jurisdiction that with regard to the overruling of a motion for directed verdict made at the close of all the evidence, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can only draw but one conclusion from the evidence, where an issue should be decided as a matter of law. *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993); *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

A trial court should direct a verdict as a matter of law only

when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Kozeny v. Miller, supra*; *Sundeen v. Lehenbauer*, 229 Neb. 727, 428 N.W.2d 629 (1988). The party against whom the verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Leonard v. Wilson*, 238 Neb. 1, 468 N.W.2d 604 (1991); *Carnes v. Weesner*, 229 Neb. 641, 428 N.W.2d 493 (1988).

As to questions of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. *Bell Abstract & Title v. Caro, Inc.*, 243 Neb. 576, 500 N.W.2d 834 (1993); *FirsTier Bank v. Triplett*, 242 Neb. 614, 497 N.W.2d 339 (1993).

## STATUTE OF LIMITATIONS

Lindsay first argues that the district court erred in determining that its claims against Gilmore, filed December 11, 1986, were time barred. Lindsay claims that under Neb. Rev. Stat. § 25-222 (Reissue 1989), it had 2 years from July 15, 1985, the date the construction project was certified as complete, before the limitations period would run out.

We have held that the point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong. *Board of Regents v. Wilscam Mullins Birge*, 230 Neb. 675, 433 N.W.2d 478 (1988). However, when reviewing a question of law, an appellate court is obliged to reach a conclusion independent of the trial court's rulings. *Central States Resources v. First Nat. Bank*, 243 Neb. 538, 501 N.W.2d 271 (1993).

As both parties assert, § 25-222 contains the limitations period applicable to an engineer rendering professional services. See *Board of Regents v. Wilscam Mullins Birge, supra*. Under the terms of § 25-222, if an action is not to be considered

time barred, the plaintiff must either file within 2 years of an alleged act or omission or show that its action falls within the exceptions of this section as to its discovery of the defendant's alleged negligence. *Kelly Klosure v. Johnson Grant & Co.*, 229 Neb. 369, 427 N.W.2d 44 (1988).

A cause of action accrues for negligence in professional services when the alleged act or omission in rendering or failure to render professional services takes place. *Murphy v. Spelts-Schultz Lumber Co.*, 240 Neb. 275, 481 N.W.2d 422 (1992). Lindsay, in its third amended petition, essentially alleged that Gilmore was negligent in designing the wells and in inspecting the construction of the wells. Thus, by the time the wells were complete, December 21, 1982, the alleged negligent act or omission had taken place. The cause of action, therefore, could have accrued no later than that date. Thus, in the absence of an exception to toll the statute from running, in order to avoid being time barred, Lindsay would have had to have filed by December 21, 1984.

However, Lindsay asserts that there is an exception which tolled the statute of limitations, making its December 11, 1986, filing timely. In support of its position, Lindsay principally relies on *Board of Regents v. Wilscam Mullins Birge, supra*. In that case, we held: "[T]he 2-year statute of limitations under § 25-222, applicable to an architect who has the responsibility to design a building and a duty to inspect throughout construction, begins to run when the construction is completed." 230 Neb. at 683, 433 N.W.2d at 483. This rule is commonly referred to as the "continuous representation" rule.

Gilmore, however, relies on *Economy Housing Co. v. Rosenberg*, 239 Neb. 267, 475 N.W.2d 899 (1991). In that case, we held that the continuous representation rule, which tolls the running of the statute of limitations, is inapplicable where the claimant discovers the alleged negligence prior to the termination of the professional relationship.

Therefore, the question here is whether, as Gilmore maintains, Lindsay discovered the alleged negligence prior to the termination of the professional relationship. It is undisputed that as of September 25, 1984, Lindsay knew that the monitoring wells accelerated the deterioration of the ground

water quality in the aquifer. However, Lindsay maintains such knowledge does not constitute discovery. Lindsay maintains that it was not until June 12, 1986, when the "Second Status Report on Aquifer Restoration" was released, that it discovered Gilmore's alleged negligence. It was not until that date, Lindsay argues, that it knew that the contamination of the aquifer was due solely to the introduction of the monitoring wells.

However, "discovery," in the context of statutes of limitations, refers to the fact that one knows of the existence of an injury and not that he has a legal right to seek redress. *St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co.*, 244 Neb. 408, 507 N.W.2d 275 (1993); *Board of Regents v. Wilscam Mullins Birge*, 230 Neb. 675, 433 N.W.2d 478 (1988). We have further held that it is not necessary that a plaintiff have knowledge of the exact nature or source of the problem, but only that a problem existed. *Economy Housing Co. v. Rosenberg, supra.* Clearly, as of September 25, 1984, this criteria had been met. It was on this date that Lindsay knew the monitoring wells accelerated the deterioration of the ground water. Since Lindsay discovered the alleged negligence on this date, which was prior to the termination of the professional relationship, the continuous representation rule was inapplicable and thus did not toll the statute of limitations.

The discovery exception to the statute of limitations also did not toll the running of the statute in this case. We have held that the discovery exception to the statute of limitations is inapplicable if facts are discovered that constitute the basis of a cause of action within 2 years from the alleged act of negligence. *Economy Housing Co. v. Rosenberg, supra.* It was thus inapplicable here, where as established above, facts constituting the basis for this cause of action were discovered no later than September 25, 1984, within 2 years from December 21, 1982, when the last alleged act of negligence took place.

Since the petition was not filed within 2 years of the last date the cause of action could have accrued, and since there were no exceptions to toll the running of the statute, Lindsay's claims against Gilmore were time barred by § 25-222. Therefore, the trial court's grant of summary judgment in favor of Gilmore was proper.

## ISSUES ON CROSS-APPEAL

Next, we consider the remaining defendants' cross-appeals. Both defendants assert that the trial court erred in failing to grant their motions for directed verdict made at the close of all evidence.

### CHRISTIANSEN'S APPEAL

On cross-appeal, Christiansen contends that the trial court should have directed a verdict on the breach of contract claim brought by Lindsay. By the end of trial, Lindsay's remaining allegations were that Christiansen breached its contract (1) in failing to fulfill and comply with the plans, specifications, and contract documents of the facility; (2) in not performing the contract monitoring wells' installation pursuant to the best known workmanship; and (3) in not performing its work and services in a skillful, careful, diligent, and workmanlike manner.

With respect to the alleged breach of contract, both parties rely on the following rule:

> "Where a contractor makes an absolute and unqualified contract to construct a building or perform a given undertaking, it is the general, and perhaps universal, rule that he assumes the risks attending the performance of the contract, and must repair and make good any injury or defect which occurs or develops before the completed work has been delivered to the other party. But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply. Under such a contract he is not permitted to vary from the prescribed plans and specifications even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled, and he remains liable only for defects resulting from improper

workmanship or other fault on his part."
*State v. Commercial Casualty Ins. Co.*, 125 Neb. 43, 50-51, 248 N.W. 807, 810-11 (1933). See, also, *Langel Chevrolet-Cadillac v. Midwest Bridge*, 213 Neb. 283, 329 N.W.2d 97 (1983); *Fuchs v. Parsons Constr. Co.*, 166 Neb. 188, 88 N.W.2d 648 (1958); *Fuchs v. Parsons Constr. Co.*, 172 Neb. 719, 111 N.W.2d 727 (1961).

Christiansen asserts that the performance rendered was, in all material respects, in accordance with plans and specifications provided and that Lindsay, therefore, cannot hold Christiansen liable for the defectiveness or insufficiency of the plans, but only for those defects resulting from improper workmanship.

Lindsay, however, asserts that because Christiansen failed to comply with the plans and specifications, Christiansen assumed the risk attending the performance of the contract. Furthermore, Lindsay submits that the trial court erred in failing to instruct the jury in that respect.

The issue before us, therefore, is whether the plans and specifications in the contract were followed. The plans reveal that the monitoring wells were originally intended to be dug to a depth of 110 feet and that only the first 3 feet below ground level of the annular spaces were to be filled with bentonite clay. As built, the wells were dug to a depth of approximately 58 feet, and the first 26 feet of the annular spaces were filled with bentonite clay. Gilmore preapproved the change in depth, but not the change in the fill of the annular spaces. Notwithstanding this evidence, we note that the contract between Lindsay and Gilmore contained the following provisions:

> 27.1 The Engineer [Gilmore] shall act as the Owner's [Lindsay's] representative during the construction period. *He shall decide questions which may arise as to quality and acceptability of materials furnished and work performed.* He shall interpret the intent of the Contract Documents in a fair and unbiased manner.

(Emphasis supplied.)

Further, we note that Gilmore certified that "construction of the acid waste treatment facility, including work incidental

thereto, has been completed and contract, therefore, has been fully performed in accordance with the plans and specifications . . . ." We also note that uncontroverted evidence establishes that Lindsay paid Christiansen pursuant to the certificate of payment issued by Gilmore covering the installation of the monitoring wells.

In *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d 747 (1983), we held that an express or implied acceptance of work as in compliance with a building contract operates as a waiver˙ of defective performance. However, this rule is inapplicable where the acceptance was under protest or induced by fraud, or where the defects were latent and unknown to the owner. *Id.* In that case, the City of Gering hired Smith Company to construct a sewer. Upon completion of the construction, the city's engineer issued a certificate to the city stating that the sewer had been completed in accordance with the terms of the contract. The engineer also recommended that the city accept the work. Pursuant to the engineer's recommendation, the city council accepted· the work. Notwithstanding the certification and acceptance, one of the engineers working on the job knew that the sewer had a sag in it. Although the city officials testified that they were unaware of the sag at the time they accepted the work, we held that this did not affect the validity of the waiver. We held that knowledge of the engineer-agent was knowledge of the principal. "If the City intended to object to the work because of the sag, a fact known to the City's engineer, it had to do so before accepting the work in reliance upon its engineer's certificate." 215 Neb. at 180, 337 N.W.2d at 751.

Likewise, if Lindsay was going to object to the construction of the wells, it had to do so before accepting the work in reliance upon Gilmore's certificate. As in *City of Gering*, Lindsay's acceptance of the work operated as a waiver of defective performance. Lindsay has neither pled nor attempted to prove that its acceptance was induced by fraud or was made under protest. In light of Lindsay's express waiver, the trial court should have directed a verdict for Christiansen.

## LAYNE-WESTERN'S APPEAL

On cross-appeal, Layne-Western also claims that the trial court erred in failing to direct a verdict in its favor on the negligence action brought by Lindsay. At the end of trial, Lindsay's remaining allegations against Layne-Western were that Layne-Western was negligent in the following particulars: (1) "failing to adequately and properly design, select and install proper and sufficient materials, drill, fabricate, assemble and install the ground water monitoring wells for their intended use"; (2) failing to adequately and properly investigate, examine, inspect, sample, test, analyze, and study the subsurface soil and hydrogeological conditions on the premises; (3) failing to consult with, retain, or engage the services of a trained, qualified, and competent hydrogeologist regarding the subsurface soil and hydrogeological conditions at the premises; (4) failing to perform its work in a reasonably good and workmanlike manner; (5) failing to warn and notify Lindsay of the risk and danger of pollution and contamination of aquifer and ground water that would result from the manner and materials that Layne-Western used in installation of the ground water monitoring wells; and (6) failing to provide and install the proper and sufficient materials in the ground water monitoring wells in compliance with the applicable federal laws and industry standards. Rather than building the wells which it contracted to build, the wells designed by Lindsay's own engineer, it appears that Lindsay would have had Layne-Western undertake all the investigation and testing necessary to design and build the wells and then design and build them.

In order to establish these duties, Lindsay relied on the testimony of one of its expert witnesses, Roy Elliott. Elliott testified that a well driller

> would want to either retain or talk to a geotechnical engineer, a geologist, or a hydrogeologist about the circumstances at the site and whether the acid could move into areas where he is going to advance a drill, or where he is going to remove fluids or where he is going to place a well.

He also said that a driller "would want to make sure that they

are not drilling into any contamination and driving it around either down with the bits or letting it drain someplace."

However, the value of the opinion of an expert witness is no stronger than the facts upon which it is based. *Mutual of Omaha v. Broussard*, 233 Neb. 916, 448 N.W.2d 600 (1989). In any event, the question of whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Schmidt v. Omaha Pub. Power Dist.*, 245 Neb. 776, 515 N.W.2d 756 (1994).

For actionable negligence to exist, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately resulting from the undischarged duty. *Id.*

> " '[D]uty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in light of the apparent risk. . . .
>
> "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another."

*Id.* at 786, 515 N.W.2d at 763.

The facts in this case are that Layne-Western was hired by Christiansen, not Lindsay. There is no evidence of a contract between Layne-Western and Lindsay. It is the law in Nebraska that in the absence of a binding agreement, express or implied, there is no privity of contract between a subcontractor and a landowner who employs the general contractor who hired the subcontractor. See, *Barnes v. Hampton*, 198 Neb. 151, 252 N.W.2d 138 (1977), *disapproved on other grounds, Van Pelt v. Greathouse*, 219 Neb. 478, 364 N.W.2d 14 (1985); *Boyd v. Benkelman Public Housing Authority*, 188 Neb. 69, 195 N.W.2d 230 (1972). Thus, there is no privity of contract between Layne-Western and Lindsay.

In Nebraska, the general rule is that one not a party to a construction contract cannot, for injuries received after the acceptance of the completed work by the contractee, maintain an action in tort for the negligent performance of the contract.

*Stover v. Ed Miller & Sons, Inc.*, 194 Neb. 422, 231 N.W.2d 700 (1975). In *Stover*, a general contractor hired the defendant subcontractor to perform excavation work. The contract between the parties explicitly provided that the general contractor and not the subcontractor would be responsible for shoring the walls of the excavation. The subcontractor completed the excavating work and left the jobsite. Later, employees of the general contractor, including the plaintiff, began working on the shoring job. During the progress of the shoring work, one wall of the excavation collapsed and the plaintiff was injured. The plaintiff sued the defendant, alleging that the defendant was negligent in failing to shore the walls. The trial court granted the defendant's motion for summary judgment and dismissed the case. On appeal, finding first that there was no privity of contract between the plaintiff and the defendant and second that the defendant had no duty to do the shoring work, this court affirmed the grant of summary judgment.

In the case at hand, it is undisputed that Lindsay hired Gilmore to design the wells and to oversee their construction. Moreover, Gilmore was contractually obligated to observe the applicable laws, many of which were drafted in order to prevent the contamination of ground water. That Gilmore failed to design wells that would prevent contamination does not impose additional responsibilities upon Layne-Western. Layne-Western contractually agreed with Christiansen to build four monitoring wells for $10 a foot. Given the limited evidence of the oral contract Layne-Western had with Christiansen, it cannot be said that Layne-Western had the extensive duties which Lindsay alleges Layne-Western had. Since, as discussed in the previous section, the work performed was accepted, Lindsay cannot maintain an action for the negligent performance of a contract against Layne-Western.

Although we have never had occasion to adopt the rule, other jurisdictions faced with similar cases have held that an independent contractor owes no duty to third persons to judge the plans, specifications, or instructions which he has merely contracted to follow unless they are so obviously dangerous that no competent contractor would follow them. See, *Hunt v.*

*Blasius*, 74 Ill. 2d 203, 384 N.E.2d 368 (1978); *Ryan v. Feeney & Sheehan Building Co.*, 239 N.Y. 43, 145 N.E. 321 (1924); *Leininger v. Stearns-Roger Manufacturing Company*, 17 Utah 2d 37, 404 P.2d 33 (1965); *Davis v. Henderlong Lumber Company*, 221 F. Supp. 129 (N.D. Ind. 1963); *Person v. Cauldwell-Wingate Co.*, 187 F.2d 832 (2d Cir. 1951), *cert. denied* 341 U.S. 936, 71 S. Ct. 855, 95 L. Ed. 1364. Lindsay has not alleged or proved that the plans and specifications were so obviously dangerous that no competent contractor would follow them. Layne-Western, therefore, was under no duty to judge the plans provided or redesign the wells. Layne-Western only had a duty to follow them, which it did in all material respects. That the annular spaces were filled with more bentonite than the plans called for is of no consequence. Lindsay's own expert, Elliott, testified that the change in the amount of bentonite was not a cause of the contamination.

Under the facts of this case, as a matter of law, Layne-Western did not owe the duties to Lindsay which Lindsay alleged. In the absence of any duty, Layne-Western could not be held liable. The district court should have granted Layne-Western's motion for a directed verdict at the close of all evidence.

## REMAINING ASSIGNMENTS OF ERROR
We do not address the remaining assignments of error, either because our holding obviates the need to address the issues raised or because they are entirely without merit.

## CONCLUSION
The judgment entered by the district court was proper, and it is therefore affirmed.

AFFIRMED.

WHITE, J., not participating.