NORTHLAND TRANSPORTATION, INC., APPELLEE, V. GORDON
MCELHOSE, DOING BUSINESS AS MCELHOSE TRUCKING OF
VERDIGRE, NEBRASKA, APPELLANT.

529 N.W.2d 809

Filed April 11, 1995.   No. A-93-573.

John Thomas for appellant.

Wesley E. Hauptman and Craig Monson for appellee.

HANNON, IRWIN, and MUES, Judges.

HANNON, Judge.

In this action the plaintiff, Northland Transportation, Inc. (Northland), sued to recover $19,232.07 it claimed to have loaned the defendant, Gordon McElhose. McElhose defended upon the basis that any money he might owe Northland originated from an illegal transaction engaged in by the parties and that therefore Northland could not recover. The trial court refused to accept the defense of illegality and directed a verdict against McElhose at the close of evidence. We conclude that under the facts in this case, the defense of illegality was not

available to McElhose because Northland was able to establish its case without relying upon any illegal activity. We therefore affirm.

## PLEADINGS

In its operative petition, Northland alleged that on February 15, 1990, McElhose contacted Northland and requested a loan; that Northland agreed to loan McElhose $19,232.07 repayable within 6 months; and that Northland issued a check to McElhose for that sum which McElhose deposited in his account. Northland further alleged that more than 6 months had expired and that McElhose had failed to repay the loan. Northland prayed for judgment in the amount of $19,232.07 plus interest provided by law. In his answer, McElhose admitted he had a conversation with Robert V. Morris, Northland's manager, on February 15, 1990, but denied asking for a loan. He admitted receiving the check and depositing it into his account. Also in the answer, McElhose alleged that the loan grew out of illegal leases which were for an illegal purpose in violation of the authority granted to McElhose by the Nebraska Public Service Commission (PSC). McElhose alleged this claimed illegality with greater specificity, but the details of this transaction can be better explained when the facts are summarized.

## SUMMARY OF FACTS

Since this is an appeal from an order granting a directed verdict for Northland, we shall summarize the facts in the light most favorable to McElhose. The only witness at the trial was Morris, Northland's sole owner, president, and manager. McElhose's case was presented during the cross-examination of Morris and through documents.

Northland is a corporation located in Laurel, Nebraska, that engages in the trucking business carrying various bulk commodities. Northland needed a trucker that held authority from the PSC to carry certain bulk commodities so Northland could carry these commodities. McElhose held the authority to carry the kind of freight Northland wanted to carry.

The law does not permit a person holding PSC authority to carry freight to lease that authority to another. McElhose could

not legally lease the privilege of operating trucks under his authority to Northland. On the other hand, the law permits a firm holding PSC authority to lease equipment from another party and to use that equipment to carry freight generated by the equipment owner for the equipment owner's customers. Apparently the law does not dictate the amount of money that can be paid for the equipment lease, nor does it prohibit the equipment lessor from acting as a dispatcher for the truck company that is leasing its equipment. The PSC even issues a standard lease for such arrangements. The authorized lease clearly provides that the entity with PSC authority retains exclusive control and supervision of the equipment. Such leases are common, but it takes no particular insight to see how a legal lease could be a cover for an arrangement whereby someone could illegally lease his or her authority.

On July 11, 1989, Northland and McElhose entered into three "Equipment Lease Agreements" on PSC forms by which McElhose leased three trucks from Northland for a term ending on March 1, 1990. The leases provided that McElhose would lease each truck at 95 percent of the gross revenue earned. On February 23, 1990, they entered into a new equipment lease agreement which provided for McElhose to lease some 20 pieces of trucking equipment from Northland under the same terms as the previous leases but for a term that ended on March 1, 1991.

McElhose offered into evidence certified copies of the records of the PSC which the court refused to receive because it felt the evidence was irrelevant. These PSC records show that several competitors of McElhose and Northland filed complaints against them claiming the operations that they were conducting under the equipment lease agreements were unlawful. The complainants alleged that the operation amounted to Northland leasing McElhose's authority rather than McElhose leasing Northland's equipment. The complainants further alleged that McElhose only held authority to carry freight " 'occasionally to and from points within the radius of 325 miles from Plainview' " but the parties were using that authority to give unrestricted statewide service to the public. These PSC records show that these complaints were extensively litigated before the PSC. The PSC found that

the parties' operation under the lease agreements was in violation of law for both of the reasons alleged by the complainants, and it issued a cease and desist order. McElhose seeks to use these findings as a basis for his contention that the debt which Northland seeks to collect is based upon illegal transactions and hence uncollectible.

The record shows without dispute that commencing in September 1989, the parties operated under the equipment lease agreements. The evidence contains an exhibit which shows the date and amount of each transaction under the lease agreements and the amounts that McElhose owed Northland under the lease. These amounts correspond to the 18 different checks that McElhose delivered to Northland from September 27, 1989, to January 15, 1990. These checks totaled $19,349.12. The evidence shows without dispute that Morris deposited all of the checks in Northland's account on February 12, 1990, and when they reached McElhose's bank for payment, his account contained only $117.05. All of these checks were stamped by the bank as paid on February 16, 1990. The $19,232.07 check from Northland to McElhose, which Northland claims was a loan, was dated February 15, 1990, and the check shows it was paid by Northland's bank on February 20. There is no doubt that this check was deposited in McElhose's account to make the previous checks to Northland good.

Northland introduced part of a deposition taken of McElhose. He does not keep track of his bank balance and did not realize that Northland was not negotiating the checks as they were delivered. When Northland finally cashed the checks, McElhose was surprised because he thought they had already cleared his bank. Upon learning from his banker that the checks had been presented and that they could not be paid from his account, McElhose called Morris and asked him what he was trying to do to him. McElhose testified that Morris said he had not cashed the checks because " 'we were settling up on a business deal.' " McElhose further testified in his deposition that Morris then said, " 'Don't worry about it,' he says, 'I'll mail you a check over right today to take care of it.' And that was the end of the conversation." McElhose claimed they never had any discussion about how the money was going to be

repaid. When asked what his intentions were with regard to the debt, he said, "Well, I thought I would probably pay it."

Since we are considering an appeal from the direction of a verdict, Morris' testimony that McElhose asked for a loan and agreed to repay it within 6 months must be disbelieved. The only evidence offered by McElhose in his case was the PSC records showing the litigation before it, which is referred to above. It would serve no purpose to describe in further detail the issues of that litigation or the findings of the PSC.

After McElhose's documentary evidence was refused, McElhose's attorney announced that he had no further evidence. Northland moved for a directed verdict. The court granted it and awarded judgment against McElhose. Within 10 days, McElhose filed a motion for a new trial. The motion presented the questions already raised during the trial.

On May 7, 1993, McElhose filed a second motion for a new trial, alleging misconduct on Northland's part along with newly discovered evidence. An affidavit in support of the second motion for a new trial was made by McElhose's trial counsel. Attached to that affidavit are a "Petition for Informal Intervention" and a "Pre-Filed Statement," signed by Morris, which are dated April 26, 1993. These documents had been filed with the PSC by Northland in a proceeding in which Don McElhose applied to have the authority formerly held by his father, Gordon McElhose, transferred to him. This is the same authority which the parties operated under in the leases described above. In this second PSC proceeding, Northland sought to have the PSC stop the transfer of the authority from Gordon McElhose to his son on the ground that the transfer would defraud his creditors, particularly Northland. In that complaint, Northland attaches a copy of the judgment attained in this case, and Morris states that prior to August 1990, Gordon McElhose leased equipment from Northland and "failed to pay the lease sums due pursuant to the lease agreement in the amount of $19,232.07."

McElhose takes the position that Northland's statement contained in the complaint contradicts Morris' testimony that the $19,232.07 was a loan. The affidavit and its attachments were received in evidence at the hearing on the motion for a new

trial. In due time, both motions for a new trial were overruled. McElhose appeals.

## ASSIGNMENTS OF ERROR

McElhose alleges the trial court erred (1) in refusing to admit in evidence a letter dated March 22, 1991, from Northland's attorney to McElhose; (2) in refusing to receive the records of the PSC; (3) in directing a verdict against McElhose because of the defense of illegality; (4) in denying the first motion for a new trial; and (5) in denying the second motion for a new trial. These separate assignments raise one basic question—whether the defense of illegality is available to McElhose under the facts in this case.

## STANDARD OF REVIEW

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994); *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993).

The party against whom the verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Lindsay Mfg. Co. v. Universal Surety Co., supra*; *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603 (1994); *Marple v. Sears, Roebuck & Co.*, 244 Neb. 274, 505 N.W.2d 715 (1993).

In reviewing the action of a trial court, an appellate court must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable

minds can draw but one conclusion from the evidence. *Larsen v. First Bank*, 245 Neb. 950, 515 N.W.2d 804 (1994); *Rohde v. Farmers Alliance Mut. Ins. Co.*, 244 Neb. 863, 509 N.W.2d 618 (1994); *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993).

## DISCUSSION

■ McElhose relies upon the principle that "[a]s a general rule, both at law and in equity, a court will not aid either party to an illegal agreement, whether executory or executed, but leaves the parties where it finds them." 17 C.J.S. *Contracts* § 272 at 1188 (1963). See, also, *Central States Health & Life v. Miracle Hills Ltd.*, 235 Neb. 592, 456 N.W.2d 474 (1990); *Abramson v. Abramson*, 161 Neb. 782, 74 N.W.2d 919 (1956). He argues that the contract under which his obligation to Northland originated was illegal, or at least the business the parties conducted under it was illegal, and that therefore a court must not aid Northland in collecting its share of the profits from that illegal business.

We start by assuming that the 18 checks which McElhose gave to Northland were a means of transmitting to Northland the money that he owed under the equipment leases entered into on July 11, 1989. We shall assume, but not decide, that the lease agreements were themselves legal but that the business conducted by the parties under the lease agreements was illegal. We will further assume, but not decide, that the business Northland conducted under McElhose's authority was illegal and that if Northland had sued McElhose to collect its share of the profits from that transaction, it could not have done so because this money was realized from an illegal transaction.

■ The general rule quoted above is undoubtedly correct, but it has many exceptions or refinements which limit its application in those cases where a plaintiff is not directly suing to enforce rights acquired under an illegal contract. One of these exceptions is, "Where one can establish his case without reliance on an illegal transaction, the illegality will not bar his recovery." 17 C.J.S., *supra*, § 276 at 1201. In this case, Northland did not sue to recover on checks issued by McElhose but upon a separate check given by Northland to McElhose.

This exception was recognized by the Nebraska Supreme

Court in *In re Estate of Lowe*, 104 Neb. 147, 175 N.W. 1015 (1920). In that case, the defendant's decedent gave a statement that he owed the plaintiff $214.94. The plaintiff sued to recover, and the estate defended upon the basis that the account balance originated from board of trade transactions which were considered against public policy and illegal at the time. The Supreme Court recognized that the transactions under which the account originated were considered gambling and contrary to public policy. The court stated, "The record shows the plaintiff was able to sustain and did maintain his cause of action without aid or assistance of any transaction growing out of an illegal act or one that might be construed as contrary to public policy." *Id.* at 148, 175 N.W. at 1016. In holding that the plaintiff could recover, the court said:

> The true test is: Does the plaintiff, to sustain his claim, of necessity have recourse to an illegal act? If he cannot maintain his cause of action without so doing, this court as a matter of law will not assist him. The plaintiff's cause of action can be maintained at law as of and for money had and received; while the defendants as a matter of law are compelled to rely upon a contract that is vitiated with the poison of immorality. To maintain his theory, we recognize the validity of his defense to set up a contract that is *contra bonos mores*. Then this court must leave him just where it found him.

*Id.* at 149, 175 N.W. at 1016.

In the case at hand, Northland sued to recover $19,232.07 which the evidence shows without dispute Northland advanced by check to McElhose, who deposited the check and kept the money. " 'A prima facie case is established by plaintiff in an action for money lent by evidence that the money was delivered to defendant, that it was a loan, and has not been repaid.' " *Cartney v. Olson*, 154 Neb. 546, 550, 48 N.W.2d 653, 656 (1951) (quoting 58 C.J.S. *Money Lent* § 7 (1948)). Northland not only proved the facts necessary to establish a prima facie case against McElhose for money lent, but McElhose admitted the necessary facts to establish Northland's prima facie case by allegations in his answer as well as answers he gave to questions in the deposition.

Northland was not required to establish the illegal contract or transactions to prove its case. It is McElhose, in his defense, who seeks to prove and rely upon the illegal transactions to nullify his obligation. As the above authority shows, McElhose cannot utilize such a defense based on illegal transactions that Northland does not rely upon to prove its case. Once Northland proved it was entitled to recover without relying on transactions that were illegal, it was entitled to recover. A defendant cannot rely upon proof of his or her illegal conduct any more than a plaintiff can do so. Therefore, the exhibits which McElhose offered into evidence were irrelevant because the illegality which they might prove would not be a defense.

McElhose's first motion for a new trial presented the same issues as discussed above and therefore will not be reconsidered. McElhose's second motion for a new trial is based upon a claim of newly discovered evidence, that is, upon a postlitigation statement by a witness which contradicts that witness' statement at trial and upon Northland's taking a position in subsequent litigation which is inconsistent with the position in this litigation. The most that this evidence could do for McElhose is to attack Morris' credibility as a witness. However, the court directed a verdict; hence, Northland's case did not depend upon Morris' credibility. Northland was entitled to a directed verdict because of the answer McElhose filed to Northland's petition and because of the answers he gave in his deposition. Therefore, the trial court correctly denied the motion for a new trial on the basis of newly discovered evidence and misconduct.

AFFIRMED.